*470 Opinión concurrente y disidente emitida por el
Juez Asociado Señor Rebollo López.
Aun cuando concurrimos con el resultado al que llega la mayoría de los integrantes del Tribunal en el presente caso —esto es, de archivar la queja presentada por el Hon. Rolando Crespo Arroyo, miembro de la Cámara de Representantes de Puerto Rico, contra el Hon. Roberto José Sánchez Ramos, Secretario de Justicia de Puerto Rico— nos vemos impedidos de suscribir y endosar la opinión mayoritaria por estar en total desacuerdo con la mayoría de las expresiones y fundamentos que se utilizan por el Tribunal en apoyo del referido resultado.
En específico, rechazamos enérgicamente la determinación mayoritaria de que este Tribunal carece de jurisdicción para intervenir en la controversia planteada y resolverla en sus méritos, esto es, si el secretario Sánchez Ramos actuó o no conforme los cánones del Código de Etica Profesional al hacer las expresiones que hizo luego de conocer el resultado del cargo criminal presentado contra el ex gobernador Pedro Rosselló González ante la Región Judicial de San Juan.
La acción mayoritaria afecta, de manera significativa, el poder inherente que tiene este Tribunal de regular la profesión de abogado y de los principios deontológicos que por décadas han regulado la profesión en Puerto Rico. Las ex-presiones ambivalentes que, al actuar así, hace el Tribunal y la confusa norma que, a esos efectos, adopta no le hacen bien al ejercicio de la profesión legal en nuestra jurisdicción.
Ya que la mayoría de los integrantes del Tribunal ha decidido no hacerlo, en el fiel cumplimiento de los deberes que nos impone el cargo que ocupamos, acometemos la delicada encomienda de expresarnos sobre la interrogante de si el Secretario de Justicia, Hon. Roberto José Sánchez Ra-mos, incurrió o no en conducta impermisible al hacer las referidas expresiones. Consideramos que tanto el secreta *471 rio Sánchez Ramos, como sus sucesores en el cargo, así como los miles de abogados que ejercen la profesión en Puerto Rico, tienen el derecho a que este caso sea resuelto en los méritos, esto es, tienen el derecho a saber si expresiones críticas extrajudiciales contra el sistema de justicia puertorriqueño y, en específico, la integridad de sus jueces, como las que hizo el Secretario Sánchez Ramos, infringen o no los cánones del Código de Etica Profesional.
I
La conducta que da lugar a la presente acción disciplinaria tiene su génesis en las expresiones públicas realizadas por el Secretario de Justicia, Hon. Roberto José Sánchez Ramos, luego de conocer la determinación de no causa para arresto de la vista en alzada que se llevó a cabo en la Sala de San Juan del Tribunal de Primera Instancia en el caso Pueblo v. Rosselló González, Crim. Núm. KMI2007-0010, en la cual se imputaban cargos por falsificación de documentos, apropiación ilegal agravada de fondos públicos y aprovechamiento del cargo público. En la referida vista se confirmó o reiteró un fallo previo de no causa realizado en las etapas preliminares del caso. Como es sabido, estos procedimientos alcanzaron gran notoriedad ante los medios noticiosos y capturaron la atención pública en general por estar involucrado un ex gobernador del Estado Libre Asociado de Puerto Rico.
Específicamente, el 22 de febrero de 2007, tras conocer el fallo adverso obtenido en la vista preliminar en alzada, el licenciado Sánchez Ramos hizo las expresiones siguientes:
Esto es un nuevo golpe a todos lo que aspiramos a que el sistema de justicia trate por igual a todos. No me cabe duda que si hubiera sido un hijo de vecino sin conexiones y sin influencia en los medios, se hubiese determinado causa y el proceso hubiera terminado en una convicción; no me cabe la más mínima duda.
*472 Al día siguiente el periódico El Vocero de Puerto Rico reseñó una entrevista realizada al licenciado Sánchez Ramos. En ésta el Secretario de Justicia expresó:
“Estoy convencido de que la historia y el pueblo sabrá juzgar a todos los participantes de este proceso. El pueblo ya lo sabe. El pueblo y los historiadores verán que la evidencia era contundente y que los cargos criminales estaban más que justificados .... Nosotros hicimos nuestro trabajo.
No podemos guiarnos por el poder, la influencia. Tenemos que tratar a todos por igual. Estamos convencidos que con esta misma relación de hechos, si la persona imputada hubiera sido cualquiera en Puerto Rico que no tenga las mismas conexiones que este imputado, hubiéramos salido airosos ....
Los ciudadanos no tienen por qué confiar ciegamente en lo que dice un juez o un Secretario de Justicia. Pueden evaluar lo que ha sucedido y poco a poco se divulgará más información para que cada cual pueda llegar a una conclusión .... Por estos mismos hechos hay una persona presa y la persona implicada, inexplicablemente ha sido exonerada. El pueblo tiene elementos más que suficientes para llegar a la conclusión de que el Departamento de Justicia descargó satisfactoriamente su función.” M. Rivera Sánchez, Tone en duda el sistema judicial’, en: Portada, El Vocero de Puerto Rico, 23 de febrero de 2007, pág. 6.
En virtud de las aludidas expresiones, el 24 de febrero de 2007 el representante Rolando Crespo Arroyo presentó una queja juramentada ante este Tribunal imputándole al Secretario de Justicia violaciones a los Cánones 9([1]) y 38 ([2]) del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. En su *473 escrito, el representante Crespo Arroyo alegó, en síntesis, que las expresiones del secretario Sánchez Ramos “traspasaron los límites de lo permitido por los Cánones de Ética Profesional que gobiernan la profesión legal en Puerto Rico”, atacando de forma mendaz e injustificada el honor y la dignidad de su profesión y causando daño a la imagen de honestidad, laboriosidad y competencia de la Rama Judicial. Querella por violación al Código de Ética Profesional, 24 de febrero de 2007, págs. 1-2.
Así las cosas, el 13 de marzo de 2007, mediante una comunicación a esos efectos —y de acuerdo con la Regla 4(c) del Reglamento de este Tribunal, 4 L.P.R.A. Ap. XXI-A— se le remitió al Secretario Sánchez Ramos una copia de la queja presentada en su contra para que, en un término de diez días, expresara su posición al respecto. Éste compareció mediante escrito titulado “Moción de Desestimación”, a través del cual argumentó que la queja presentada debía ser desestimada. Entre otras cosas, el licenciado Sánchez Ra-mos cuestionó la legitimación activa del representante Crespo Arroyo para promover la presente acción disciplinaria. Citando los casos In re Secretario de Justicia [I], 118 D.P.R. 827 (1987), e In re Secretario de Justicia [II], 126 D.P.R. 463 (1990), el secretario Sánchez Ramos adujo que Crespo Arroyo falló en justificar satisfactoriamente un interés legítimo ético y demostrar un perjuicio real directo. Asimismo, alegó que con su actuación el promovente pretendía vindicar un daño abstracto, hipotético y generalizado.
Como segundo argumento en apoyo de su solicitud de desestimación, el Secretario Sánchez Ramos expresó que, aun si este Tribunal entendiese que el quejoso tiene legitimación activa, procedía la desestimación de la presente acción disciplinaria al amparo de la Primera Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1. A tales efectos, argumentó que la referida enmienda protege y abarca las expresiones críticas que se emiten sobre la Judicatura por ser ésta parte de nuestro sistema de gobierno.
*474 Basado en esta premisa el secretario Sánchez Ramos elaboró la tesis de que no es posible sancionar las expresiones críticas que realizan los abogados y fiscales sobre el funcionamiento o integridad de la Judicatura o sus Jueces, a menos que “(a) siendo susceptible de probarse falsa, (b) en efecto se pruebe: (i) que dicha expresión es falsa; y (ii) que ha sido hecha con pleno conocimiento, o en grave menosprecio, de su falsedad”. Moción de desestimación de 22 de marzo de 2007, pág. 16. De esta forma argumentó que sus expresiones sobre el desempeño de la Rama Judicial, y los alegados problemas que existen sobre trato desigual, gozan de completa inmunidad bajo la Primera Enmienda de la Constitución de Estados Unidos por constituir una “opinión subjetiva” que, según él, no es susceptible de probarse falsa.
Además, el secretario Sánchez Ramos cuestionó la constitucionalidad, tanto de su faz como en su aplicación, de los Cánones 9 y 38 del Código de Ética Profesional, ante. Adujo que los referidos cánones son inconstitucionales de su faz en tanto pretenden vedar expresiones simplemente irrespetuosas o indignas sin atención a las exigencias de lo resuelto en New York Times Co. v. Sullivan, 376 U.S. 254 (1964), y su progenie. Asimismo, alegó que “en su aplicación dichos cánones resultarían igualmente inconstitucionales si se utilizan para sancionar [sus] expresiones ..., en tanto las mi [s] mas están protegidas por la Constitución federal”. Moción de desestimación, ante, pág. 23.
Así las cosas, el 30 de marzo de 2007 el representante Crespo Arroyo compareció ante este Tribunal mediante un escrito titulado “Moción Informando Interés de Replicar al Ledo. Roberto Sánchez Ramos”, para solicitar un término de veinte días para expresarse con relación a la desestimación solicitada. Concedido dicho término, éste compareció el 24 de abril de 2007 alegando, en síntesis, que la doctrina esbozada por el Secretario para cuestionar su interés en este caso no debe ser aplicada a los hechos que nos ocupan, *475 pues, según alegó, “cualquier hijo de vecino” puede entablar una queja contra cualquier abogado que no se desempeñe en conformidad con las exigencias de los cánones del Código de Etica Profesional. Alegó que la referida doctrina no aplica al presente caso, pues lo que se cuestiona es la actuación del secretario Sánchez Ramos, en su capacidad de abogado y funcionario del tribunal, y no como Secretario de Justicia.
Citando jurisprudencia de este Tribunal,([3]) Crespo Arroyo expresó que el hecho de que un abogado defienda apasionada y diligentemente la causa de acción de su cliente no es incompatible con la exigencia de decoro y respeto hacia los tribunales y sus magistrados. A tono con lo anterior, expresó que la Primera Enmienda de la Constitución federal no puede ser utilizada como subterfugio en apoyo de ataques insidiosos y demagogos contra nuestros tribunales y que en nuestra jurisdicción existen guías que delimitan el análisis ético que se realiza en este tipo de caso.([4])
En su “Réplica”, el secretario Sánchez Ramos reiteró sus argumentos sobre falta de legitimación activa y cuestionó los planteamientos esbozados por el representante Crespo Arroyo, en específico, la aplicación de la jurisprudencia federal presentada ante nos por el Representante.([5])
Trabada así la controversia, el 12 de junio de 2007 le concedimos un término de veinte días al secretario Sánchez Ramos para que informara si los escritos que había presentado ante este Tribunal constituían su contestación a la queja y, si en la afirmativa, daba por sometido el asunto para la decisión correspondiente. Del mismo modo, *476 concedimos un término simultáneo al representante Crespo Arroyo para que informara si las grabaciones y recortes periodísticos que acompañó con su queja constituían toda la prueba disponible en torno a las expresiones del Secretario de Justicia.
El representante Crespo Arroyo compareció mediante una moción informativa, presentada el 9 de julio de 2007, en la cual confirmó que las grabaciones, recortes periodísticos y la posición del licenciado Sánchez Ramos de no negar las expresiones emitidas era la base para establecer que éste había violado los cánones del Código de Etica Profesional. El Secretario de Justicia, por su parte, dio por sometido el asunto en cuanto a las controversias de derecho atendidas en sus escritos, pero se negó a dar por sometidas las supuestas controversias de hecho que, según alegó, surgirían en la situación de que este Tribunal entendiera que los Cánones 9 y 38, ante, son válidos de su faz y que pueden ser aplicados a las expresiones aquí en controversia. En ese sentido expresó que no renunciaba a que se tengan que probar los elementos fácticos de false-dad y conocimiento establecidos en New York Times Co. v. Sullivan, ante, y su progenie, y a que en el debido juicio plenario tenga la oportunidad de confrontar la prueba que se presente en su contra y que, a su vez, pueda presentar la que estime conveniente a su favor.
II
A. Como señaláramos en el acápite que antecede, en el presente caso se cuestiona el “interés” (standing) del representante Crespo Arroyo en promover una acción disciplinaria contra el secretario Sánchez Ramos. Como punta de lanza se utiliza la normativa establecida hace varias décadas en los casos In re Secretario de Justicia [I], ante, e In re Secretario de Justicia [II], ante, en los cuales establecimos los linderos o parámetros que, como norma general, limi *477 tan la jurisdicción disciplinaria de este Tribunal en lo que respecta a las quejas presentadas contra el Secretario de Justicia de Puerto Rico.
En los referidos casos, este Tribunal tuvo ante su consideración dos quejas presentadas contra el entonces Secretario de Justicia, Ledo. Héctor Rivera Cruz. En aquella ocasión tuvimos la oportunidad de expresarnos sobre el alcance del poder inherente de este Tribunal para regular la profesión de la abogacía frente a una queja presentada en contra del titular de mayor jerarquía del Departamento de Justicia y el potencial conflicto de separación de poderes que se impone cuando éste actúa dentro un marco políticopartidista.
En el primer caso, resuelto en 1987, la controversia giró en torno a una opinión emitida por el Secretario Rivera Cruz que resultó ser adversa a los intereses de varios codemandados que eran representados por la División de Litigios del Departamento. Por estos hechos se presentó una queja contra Secretario de Justicia imputándole, entre otras cosas, violaciones al Canon 21 (sobre representación de intereses encontrados) y al Canon 19, que impone a todo abogado el deber de mantener informados a sus representados. 4 L.P.R.A. Ap. IX.
Ante el argumento del licenciado Rivera Cruz sobre la imposibilidad de que un Secretario de Justicia pueda advertir este tipo de conflicto por el tamaño y el número de abogados que laboran en el Departamento de Justicia ex-presamos que el titular de la agencia no está indefectiblemente sujeto a procedimientos disciplinarios por violaciones éticas atribuibles, única y directamente, a otros abogados del referido Departamento. En ese sentido, explicamos que “¡e]n un cargo tan difícil y complejo, el abanico de posibilidades de error de juicio es inmenso” y que las probabilidades de que este funcionario incurra en conflictos, de buena fe y sin intención, es una premisa aceptable. In re Secretario de Justicia [I], ante, pág. 849.
*478 A tono con lo anterior, expresamos que cada situación planteada de este género ético requiere una cuidadosa reflexión sobre si se asume o no jurisdicción disciplinaria. Del mismo modo, indicamos que en este tipo de caso se requiere “una meticulosa y ponderada depuración de los hechos a los fines de fijar si ha habido infracción a algún canon y sobre quién realmente recae responsabilidad”. In re Secretario de Justicia [I], ante, pág. 850.
Con lo anteriormente expresado en mente, sin que ello significara la exclusión y evaluación de otros factores, o abdicar automáticamente nuestra jurisdicción disciplinaria, resolvimos que ante este tipo de queja o planteamiento este Foro se abstendría prudencialmente de asumirla y ejercerla cuando de su faz: “(1) el promovente no justifique satisfactoriamente un interés legítimo ético y peijuicio real directo; (2) el asunto, aunque de carácter ético, sea prematuro; (3) los hechos no estén debidamente documentados o sustanciados, o (4) no sean materia ético-adjudicable por corresponder propiamente al debate del Poder Legislativo o Ejecutivo, o pertenecer a la arena de la política partidista”. In re Secretario de Justicia [II], ante, págs. 468-469.
Asimismo establecimos la necesidad de que en este tipo de caso concurran tres requisitos básicos al imponer responsabilidad ética al Secretario de Justicia, a saber: (1) que se trate de un asunto importante, esto es, no rutinario; (2) que el Secretario de Justicia tenga una participación activa en el asunto, es decir, que intervenga personalmente, y (3) que el Secretario tenga conocimiento personal de las distintas cuestiones o puntos involucrados en éste. In re Secretario de Justicia [I], ante, pág. 865.
Al aplicar esta normativa a los hechos del referido caso, este Tribunal concluyó que la queja presentada contra el entonces secretario Rivera Cruz era ético-adjudicable por centrarse en una actuación exclusiva relacionada con su función de abogado-asesor. Véase In re Secretario de Justicia [I], ante, pág. 850. De esta forma asumimos juris *479 dicción en el caso y concluimos que al emitir su opinión el Secretario Rivera Cruz había incurrido en un insalvable conflicto de interés por razón de la representación legal simultánea asumida en el caso. Resolvimos, además, que con su actuación, el Ledo. Héctor Rivera Cruz violó lo dispuesto en el Canon 19 del Código de Etica Profesional, ante, al incumplir con su obligación de mantener informados a sus representados con relación a un asunto importante y donde éste tuvo una “intervención activa y directa”.
A tres años de resuelto ese caso, este Tribunal se enfrentó, nuevamente, a una queja presentada contra el secretario Rivera Cruz. In re Secretario de Justicia [II], ante. Esta vez, la controversia surgió por expresiones realizadas por este funcionario contra un magistrado federal que ordenó el encarcelamiento por desacato civil del entonces Alcalde de Moca. Ante estas circunstancias el Secretario, actuando en calidad de Gobernador interino, hizo las expresiones siguientes:
Bueno, sencillamente, esto, a nuestro juicio, ha sido un atropello por parte del tribunal federal, específicamente del juez que ordenó el encarcelamiento del alcalde y a nuestro juicio es un abuso de poder de la jurisdicción federal!;] de lo que se trata es de un alcalde que tiene un caso muy meritorio que fue visto en un tribunal federal y que está en apelación en el Circuito de Boston —po[rq]ue hay mérito en el caso. En el entretanto el juez desea y ordena al alcalde que pague alrededor de $200,000 a unos empleados que fueron cesanteados que ya el juez sí logró reponerlos .... (Escolio omitido y énfasis suplido.) Resolución de 16 de noviembre de 1987, págs. 3-4. In re Secretario de Justicia [II], ante, pág. 465.
En aquella ocasión, al evaluar la procedencia de la queja presentada, este Tribunal prestó especial atención al hecho de que las expresiones fueron realizadas mientras el secretario Rivera Cruz fungía como Gobernador interino y no en calidad de abogado-asesor del Departamento de Justicia. A esos efectos, expresamos:
También tenemos presente que algunas de las funciones *480 adicionales del Secretario de Justicia [apuntadas] —integrante del Gabinete, segundo en sucesión al Gobernador y miembro de varias juntas y organismos— pueden, directa o indirectamente, involucrarlo, o moverlo a involucrarse, en las polémicas de asuntos públicos polarizados, impregnados o no de contenido político-partidista, que trascienden la visión tradicional del papel de principal abogado-asesor gubernamental. La línea es tenue, y por ende, a veces difícil de separar el pronunciamiento a título clásico de Secretario de Justicia (abogado-asesor), y de aquel que irradia como miembro del Gabinete, o una junta, o Gobernador interino. In re Secretario de Justicia [I], supra, págs. 847-848.
Conforme a lo anterior, resolvimos que de ejercer jurisdicción disciplinaria en este caso, este Tribunal estaría disciplinando no al Secretario de Justicia, sino al Gobernador interino y Primer Ejecutivo de Puerto Rico. Bajo esta premisa concluimos que “las expresiones vertidas no justifica [ban] esta clase de intervención con la Rama Ejecutiva”. In re Secretario de Justicia [II], ante, pág. 470.
Como resulta meridianamente claro de lo antes expresado, en ninguno de los casos reseñados este Tribunal pretendió crear una inmunidad disciplinaria a favor del abogado que ocupa el cargo de Secretario de Justicia y, mucho menos, limitar la jurisdicción de este Tribunal ante planteamientos legítimos que pongan en duda el comportamiento ético de un miembro del foro, como lo es él. Todo lo contrario; en ambas opiniones fuimos enfáticos al expresar que al abogado que ocupa este honroso cargo “le aplican incuestionablemente los principios deontológicos que regulan la profesión de abogado, con las modificaciones aceptables y cognoscibles resultantes de las peculiaridades inherentes que conlleva esa compleja gestión pública”. (Enfasis suplido.) In re Secretario de Justicia [I], ante, pág. 849. Esto, en palabras simples y sencillas, significa que al Secretario de Justicia le aplican los mismos cánones de ética que regulan las actuaciones de los miles de abogados que a diario ejercen la profesión en nuestra jurisdicción.
*481 III
Es evidente que en el presente caso no estamos ante ninguno de los escenarios contemplados en los casos reseñados. En primer lugar debe destacarse que la queja aquí en controversia no está de forma alguna relacionada con actuaciones realizadas por otros abogados del Departamento, sino que corresponde a una actuación exclusiva del Secretario en su función de abogado titular de la agencia. Tampoco puede argumentarse, como pretende hacerlo en su comparecencia el secretario Sánchez Ramos, que estamos ante un potencial conflicto de interés por tratarse de "una crítica que una Rama de gobierno lanza en cuanto al desempeño de otra”.
El cuadro fáctico que se nos presenta en el caso de autos dista mucho de lo atendido por este Tribunal en In re Secretario de Justicia [II], ante. En el presente caso las ex-presiones del secretario Sánchez Ramos no fueron realizadas en calidad de Gobernador interino o en el plano político partidista, sino como un abogado que funge como titular del Departamento de Justicia y en reacción a un fallo ad-verso recibido por su departamento. Esto es, como en tantos otros casos, estamos ante un representante legal de una parte, esta vez del Ministerio Público, que tras finalizar los procedimientos judiciales y a preguntas de la prensa, hace unas expresiones desafortunadas sobre el resultado de un caso. El hecho de que se trate de un miembro del foro que a su vez es el funcionario de mayor jerarquía en el Departamento de Justicia no nos traslada automáticamente al ámbito político-partidista que activaría las salvaguardas establecidas por este Tribunal en los casos antes discutidos, ni convierte su actuación en la de la rama de gobierno que representa.
Siendo así, consideramos que la violación ética que hoy se le imputa al secretario Sánchez Ramos está intrínsecamente relacionada con una actuación personal y ético *482 adjudicable realizada en su función de abogado titular de la agencia que representa. En vista de lo anterior, entendemos que en el presente caso no están presentes las circunstancias fácticas que activarían las salvaguardas establecidas por este tribunal en In re Secretario de Justicia [I], ante, o In re Secretario de Justicia [II], ante, por lo que prevalece el ejercicio de nuestra jurisdicción disciplinaria, independientemente del propósito que persiga el promovente o la identidad de éste([6]) Véanse: In re Alverio Sánchez, 172 D.P.R. 181 (2007); K-Mart Corp. v. Walgreens of P.R., Inc., 121 D.P.R. 633 (1988); In re Añeses, 117 D.P.R. 134 (1986).
Ante esta conclusión, es evidente que estamos impedidos de descartar los planteamientos éticos presentados ante nos por el simple hecho de que se alegue que el promovente carece de “legitimación activa” para presentarlos. Según ese tenor, puntualizamos y enfatizamos lo resuelto por este Tribunal en In re González Blanes, 65 D.P.R. 381 (1945), a los efectos de que, en materia disciplinaria, nuestro poder inherente es tan abarcador que nos permite ordenar el inicio de una investigación disciplinaria sin necesidad de tener que esperar que se presente queja alguna.
IV

Abiertas, claramente, las puertas de este Tribunal, respecto a su jurisdicción, procedemos a evaluar en sus méritos la controversia ante nuestra consideración.

De entrada, debemos precisar que no existe —ni en este Tribunal ni en el Tribunal Supremo federal— un precedente específico, en materia disciplinaria, que nos ilustre sobre el alcance de la protección constitucional que cobija *483 las expresiones críticas extrajudiciales que realizan los abogados contra la administración de la justicia o de sus magistrados. R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1558.
No obstante lo anterior, debemos destacar que sí existen por parte de ambos foros judiciales expresiones contundentes a favor del respeto que merecen los tribunales y la responsabilidad de los miembros de la clase togada de velar por el buen funcionamiento del sistema de justicia. En ese sentido, este Tribunal ha ido más lejos que el Supremo federal al establecer criterios específicos para evaluar las ex-presiones que realizan los abogados contra los tribunales o sus magistrados. Evaluemos, en detalle, la referida jurisprudencia:
El caso In re González Blanes, ante, marca el punto de partida con relación a este tema. En el referido caso este Tribunal tuvo ante su consideración una imputación de aceptación de soborno realizada por un abogado contra un juez del Tribunal de Primera Instancia. En aquella ocasión este Tribunal advirtió que en este tipo de caso la acción disciplinaria no procede si los hechos alegados son ciertos, pero aclaró que “aun no siéndolos, si el querellado [tiene] fundamento o causa probable para creer que lo [son] y [la expresión] no fue presentada maliciosamente sino con el propósito de obtener el juicio imparcial a que todo litigante tiene derecho, entonces el querellado tendría que ser absuelto del disbarment”. (Enfasis suplido.) In re González Blanes, ante, pág. 393.
Transcurridos catorce años de resuelto ese caso, en In re Andréu Ribas, 81 D.P.R. 90, 119 (1959), este Tribunal, al abordar nuevamente este tema, fue un poco más lejos. A esos efectos expresó que “[d]ebe considerarse justa causa para imponer sanciones disciplinarias toda imputación, oral o escrita, de la comisión de hechos inmorales o ilegales, formulada por un abogado, que no esté respaldada *484 {warranted) por evidencia competente, que tienda a degradar o a afectar la dignidad, honorabilidad e integridad de los tribunales o de sus funcionarios o que puedan debilitar o destruir el respeto a o la confianza pública en los mismos”.
Al así resolver, el Tribunal expresó que “el derecho a ejercer la profesión de abogado no es un derecho adquirido, sino un privilegio” (In re Andréu Ribas, ante, pág. 119), y que la obligación que asume el abogado no consiste simplemente en obedecer nuestra Constitución y los estatutos en vigor, sino que, como parte consustancial de esa obligación, éste también tiene el deber de mantener, en todo momento, el correspondiente respeto a los tribunales de justicia y a todo funcionario judicial, sin menoscabo de su derecho a sostener una defensa vigorosa y a criticar con motivo fundado y de manera respetuosa la conducta de los funcionarios judiciales. Véase In re Andréu Ribas, ante, págs. 119-120.
Citando el caso Cordero v. Rivera, 74 D.P.R. 586, 609 (1953), el Tribunal expresó en In re Andréu Ribas, ante, pág. 120, que “[p]or el sitio que ocupan en la sociedad y por su condición de funcionarios de los tribunales, los abogados deben ser cautelosos al hacer a un Juez imputaciones de tal magnitud y alcance, [atribuir error en la apreciación de la prueba ‘con mente prevenida y con pasión y prejuicio’] y ello solamente si están convencidos, en lo más profundo de sus conciencias —a la vez no prevenidas— de la certeza de sus afirmaciones, y entonces para exigir la verdadera responsabilidad que tan grave desviación del deber conlleva”. (Enfasis y corchetes suplidos.)
Un caso más reciente sobre este tema es In re Pagán, 116 D.P.R. 107 (1985). En éste la Oficina del Procurador General imputó al Ledo. Iván L. Pagán haber actuado en forma antiética y en abierta violación al Canon 9 del Código de Etica Profesional al acusar al magistrado ante quien litigaba su caso por parcialidad y prejuicio y haber realizado alegaciones difamatorias con relación a su desempeño, por el mero hecho de haber tomado una decisión *485 judicial con la cual no estuvo de acuerdo. En aquella ocasión, al rechazar la conducta exhibida por el abogado, ex-presamos:
La práctica de la abogacía exige hacia los tribunales constante respeto. Para reclamar derechos y solventar controversias no es menester lastimar la dignidad personal ni institucional de los miembros de la judicatura, como de ninguna otra persona. “La estatura moral e intelectual inherente al ejercicio de la abogacía impone un debate jurídico libre de personalismos y posiciones subjetivas que lo degraden a vulgar diatriba.” García Santiago v. Acosta, 104 D.P.R. 321, 323 (1975). Las discrepancias con los dictámenes judiciales no es licencia para el lenguaje impropio e hiriente. “El comportamiento judicial que de alguna manera afecte los derechos de un ... litigante puede llevarse al récord para la acción correctiva que proceda por un tribunal superior, a tenor con lo que deba ser un juicio imparcial y justo.” Pueblo v. Susoni, 81 D.P.R. 124, 154 (1959). Razones de civilidad imponen esta sencilla norma.
La búsqueda de la justicia no justifica medios reprobables. Ello es un principio universal tan hondamente cimentado que no requiere elaboración. (Cita omitida y énfasis suplido.) In re Pagán, ante, págs. 111-112.
A sólo un año de resuelto ese caso, en In re Cardona Álvarez, 116 D.P.R. 895 (1986), este Tribunal estableció pautas adicionales con relación a los parámetros que deben ser observados al evaluar expresiones de este tipo. Como preámbulo a esta determinación expresamos, entonces, que la moderación del lenguaje es uno de los primeros deberes del abogado, por lo que éste nunca puede olvidar que ha sido interpuesto entre los litigantes y la justicia, para sustituir a los impulsos del interés personal y al lenguaje de las pasiones, la calma de la razón y el lenguaje de la verdad. Id., pág. 897. Expresamos, además, en dicho caso que el abogado debe evitar, en todos los casos, la inconveniencia y la grosería de los términos, el empleo de imputaciones y de hechos extraños o inútiles al asunto y, sobre todo, las alegaciones contrarias a la verdad o desprovistas de una razonable presunción de exactitud. Id.
*486 A esos mismos efectos, expresamos en dicho caso que, como tal, el abogado debe tener un claro concepto de la misión fundamental pública que ejerce y que en la escala de valores profesionales ha de colocar a ésta por encima de cualesquiera personalismos. In re Cardona Álvarez, ante, pág. 903. A tono con lo anterior, puntualizamos que “[e]l abogado nunca debe olvidar que es un funcionario que tiene la obligación de mantener y promover inmaculada la imagen de la justicia”. íd., pág. 904.
Con esto en mente, resolvimos que al evaluar la legitimidad de la conducta oral o escrita del abogado, y balancear los intereses éticos y de libertad forense expuestos, este Tribunal tomaría en consideración varios criterios básicos, a saber, (a) si aunque equivocado, creía en la validez de las imputaciones al juez; (b) si aunque los hechos no eran ciertos, tenía motivos fundados o causa probable para creer en su veracidad, y (c) si la imputación no fue hecha maliciosamente con el propósito deliberado de denigrar al tribunal. In re Cardona Álvarez, ante, págs. 905-906.
Añadimos en dicha decisión que un abogado incumple su deber profesional para con los tribunales —y viola lo dispuesto en el Canon 9 del Código de Etica Profesional, ante— cuando no discute ni sustancia las alegaciones críticas que realiza contra los tribunales y que el constante recurrir al apuntamiento de que el tribunal actuó “con prejuicio, pasión y parcialidad”, sin sustanciarlo o sin motivos fundados para así creerlo, es un comportamiento censurable que hemos de rechazar. Véase In re Cardona Álvarez, ante, pág. 901.
De esta forma, y a modo de resumen, expresamos:
Con arreglo a esta visión doctrinaria, hemos impuesto sanciones disciplinarias a un abogado, por hacer imputaciones orales o escritas, sobre la comisión de hechos inmorales o ilegales —que no están respaldadas por evidencia competente— tendente a degradar la dignidad, honorabilidad e integridad de los tribunales y de sus funcionarios o que puedan debilitar la confianza pública en los mismos. In re Andréu Ribas, su *487 pra, pág. 119.([7]) Asimismo por la presentación de mociones y escritos en los que se formulan acusaciones a los magistrados, sin fundamentos, mediante el uso de lenguaje impropio y ofensivo, lo cual constituye conducta lesiva a la dignidad del tribunal. In re Padilla, supra, pág. 261.([8]) In re Cardona Álvarez, ante, pág. 906.
Es importante puntualizar, sin embargo, que en este caso fuimos enfáticos al señalar que el respeto hacia los tribunales, y su exaltación como uno de los postulados deontológicos más hermosos, no implica de forma alguna el establecimiento de una censura previa. Véase In re Cardona Álvarez, ante, pág. 904. De esta forma reconocimos que “la crítica judicial sana y oportuna es un instrumento necesario y efectivo para mantener a los jueces alertas y atentos al estricto cumplimiento de sus funciones”. (Énfasis suplido.) Id. Asimismo, señalamos que “[t]al crítica es un interés legítimo constitucional que debemos proteger. Es un vehículo apropiado para producir cambios favorables en el sistema de administración de justicia”. Id.
A esos efectos, hemos sido consecuentes al reconocer que en nuestra jurisdicción los abogados tienen el derecho de hacer todos los planteamientos que entiendan necesarios en defensa de los intereses de su cliente y que la crítica constructiva a la labor judicial siempre es bienvenida y necesaria por cuanto la misma quizás constituye la “medicina” más eficaz y necesaria para mejorar la labor judicial que realizamos. Véase In re Cardona Álvarez, ante, pág. 904.
Debe quedar claro, sin embargo, que lo anteriormente expresado no significa que el abogado tenga licencia absoluta en el uso del lenguaje para poner en entredicho o mancillar la dignidad de los jueces. In re Cardona Álvarez, ante, págs. 906-907. En ese sentido hemos recalcado que *488 tal conducta y estilo forense rebasan el ámbito de lo legítimo, por lo que deben ser desalentadas. Id. En conclusión, nuestra concepción panorámica del libre fluir de ideas, inclusive las críticas, no significa que se puedan traspasar los límites de la civilidad y la corrección. Véase Id., pág. 905.
V
A. Como señaláramos en el acápite que antecede, no existe en la jurisdicción norteamericana un precedente específico que nos ilustre sobre el curso de acción que debemos seguir en el presente caso. Ello, sin embargo, no significa que este tipo de controversia haya estado ausente de discusión y controversia en dicha jurisdicción. Por el valor ilustrativo que pueda tener, examinamos brevemente la trayectoria jurisprudencial norteamericana desarrollada en torno a este tema.
Desde mucho antes del siglo 20, en Bradley v. Fisher, 80 U.S. 335, 355 (1871), el Tribunal Supremo de Estados Uni-dos ya había expresado que:
... [T]he obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts. (Enfasis suplido.)
Años más tarde, en ocasión de resolver el caso In re Sawyer, 360 U.S. 622 (1959), una pluralidad de Jueces de ese alto Tribunal validó el interés de los abogados en criticar o expresar su punto de vista con relación al estado de derecho y puntualizó que este tipo de expresión no puede ser utilizada como fundamento para imponer me *489 didas disciplinarias.([9]) Elio no obstante, el Tribunal fue enfático al señalar que esta libertad no incluye el derecho a atacar la motivación, integridad o competencia de los jueces.([10])
Otro caso resuelto por el más alto Foro federal con relación a este asunto es Garrison v. Louisiana, 379 U.S. 64 (1964). En éste, el Tribunal se enfrentó a una controversia en la que un fiscal fue acusado y condenado por difamación criminal tras realizar expresiones críticas contra los jueces de la sala de lo criminal de su distrito, atribuyéndoles el atraso en los casos criminales y acusándolos de ineficientes y perezosos.
En aquella ocasión una mayoría del Tribunal dejó sin efecto la convicción impuesta al concluir que el estatuto en cuestión era inconstitucional a la luz de lo establecido en New York Times Co. v. Sullivan, ante.([11]) Al así resolver, el Tribunal concluyó que la norma establecida en el referido caso con relación a remedios civiles por difamación —la cual exige que tratándose de críticas a funcionarios públicos, se pruebe que las expresiones fueron realizadas con conocimiento de su falsedad o con grave menosprecio de si la ex-presión era o no falsa— aplica igualmente a casos en *490 los que se impone una sanción criminal. ([12]) A esos efectos, el Tribunal expresó:
We held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in New York Times, 376 U.S., at 279-280, apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since "... erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the ‘breathing space’ that they ‘need ... to survive’ ...” 376 U.S., at 271-272, only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions. Garrison v. Louisiana, 379 U.S. 64, 74 (1964).
Sobre este mismo tema, en 1985 el Tribunal Supremo de Estados Unidos resolvió el caso In re Snyder, 472 U.S. 634 (1985). En este caso dicho Tribunal revocó una suspensión de seis meses impuesta a un abogado que envió una enérgica comunicación a la secretaria de un juez del Tribunal de Circuito de Apelaciones para el Octavo Circuito. En su comunicación, el abogado criticó el procedimiento observado por el tribunal al administrar la Ley sobre Justicia Criminal y solicitó que se le eliminara de las listas de abogados de oficio de esa jurisdicción.([13]) En aquella ocasión el *491 Tribunal entendió que las críticas del abogado contra la administración de esta ley no era causa suficiente para imponer una medida disciplinaria. Al fundamentar su determinación, el Tribunal expresó:
However, even assuming that the letter exhibited an unlawyerlike rudeness, a single incident of rudeness or lack of professional courtesy —in this context— does not support a finding of contemptuous or contumacious conduct, or a finding that a lawyer is “not presently fit to practice law in the federal courts.” Nor does it rise to the level of “conduct unbecoming a member of the bar” warranting suspension from practice. (Enfasis suplido.) In re Snyder, ante, pág. 647.
Es de notar que, aun cuando el Tribunal rehusó discutir formalmente las posibles implicaciones de la Primera Enmienda —argumento que fue presentado por el abogado como una de sus defensas— aprovechó la ocasión para ex-presarse sobre el asunto, al señalar:
As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers .... The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice. In re Snyder, ante, págs. 644-645.
A seis años de emitida esta opinión, el Tribunal Supremo de Estados Unidos retomó el tema, pero esta vez en el contexto de expresiones públicas realizadas por los abogados con relación a casos pendientes ante los tribunales. Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991). En esta ocasión el abogado fue disciplinado por hacer expresiones a la *492 prensa sobre un caso criminal pendiente de juicio en el que éste representaba al acusado.([14]) Al sostener la sanción impuesta, el Tribunal Supremo de Nevada había determinado que: “[the attorney] knew or reasonably should have known that his comments had a substantial likelihood of materially prejudicing the adjudication of his client’s case”. Id., pág. 1065.
Ante el Tribunal Supremo de Estados Unidos el abogado argumentó que en este tipo de caso la Primera Enmienda requiere que se cumpla con un estándar más estricto al determinar si se impone o no una medida disciplinaria. Este propuso el estándar de “clear and present danger of actual prejudice or an imminent threat”. A1 rechazar la contención del abogado, la mayoría del Tribunal expresó:
Even in an area far from the courtroom and the pendency of a case, our decisions dealing with a lawyer’s right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics, have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses. In each of these cases, we engaged in a balancing process, weighing the State’s interest in the regulation of a specialized profession against a lawyer’s First Amendment interest in the kind of speech that was at issue. These cases recognize the long-established principle stated in In re Cohen, 7 N.Y.2d 488, 495, 166 N.E.2d 672, 675, 199 N.Y.S.2d 658 (1960): “Appellant as a citizen could not be denied any of the common rights of citizens. But he stood before the inquiry and before the Appellate Division in another quite different capacity, also. As a lawyer he was ‘an officer of the court, and, like the court itself, an instrument ... of justice ....’” (Citas omitidas y énfasis suplido.) Gentile v. State Bar of Nevada, ante, págs. 1073-1074.
A renglón seguido, el Tribunal expresó:
*493 We think that the quoted statements from our opinions in In re Sawyer, 360 U.S. 622, 3 L. Ed. 2d 1473, 79 S. Ct. 1376 (1959), and Sheppard v. Maxwell, supra, rather plainly indicate that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press in Nebraska Press Assn. v. Stuart, 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976), and the cases which preceded it. Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct. We conclude that the “substantial likelihood of material prejudice” standard applied by Nevada and most other States satisfies the First Amendment. (Énfasis suplido.) íd., pág. 1074.
We conclude that the “substantial likelihood of material prejudice” standard applied by Nevada and most other States satisfies the First Amendment. íd., pág. 1063.
B. De acuerdo con las posiciones adoptadas por el Tribunal Supremo de Estados Unidos en torno a este tema, los tribunales estatales de la jurisdicción norteamericana han desarrollado tres vertientes principales.([15]) La primera de estas vertientes, adoptada por los estados de Iowa, Kansas y Nevada, rechaza la extensión de la protección de la Primera Enmienda a expresiones de abogados que tiendan a violar estatutos, cánones, reglas disciplinarias o cualquier otra disposición que proscriba la conducta antiética.([16]) Los tribuna *494 les adheridos a esta vertiente han entendido que es suficiente con que la expresión se considere antiética para que automáticamente quede desprovista de la protección constitucional.([17])
La segunda vertiente desarrollada sobre este tema surge de lo resuelto por los foros apelativos de los estados de West Virginia, Nueva York, Texas y California.([18]) En estos estados los tribunales han aplicando los principios tradicionales de la Primera Enmienda para determinar si la expresión en controversia está o no protegida constitucionalmente.([19]) De esta forma se ha entendido que las expresiones críticas de los abogados contra los tribunales, sus procedimientos o magistrados están protegidas por la Primera Enmienda a me-nos que éstas representen “a serious and imminent threat to the fairness and integrity of the judicial system”.([20]) Conforme a esta vertiente, se ha entendido que aim los ataques personales realizados por abogados contra los jueces u oficiales del tribunal están protegidos por la Primera Enmienda, a menos que se realicen con conocimiento de su falsedad o con grave menosprecio de si la expresión es o no falsa.([21])
Los tribunales que han adoptado esta vertiente aplican el estándar de “malicia real” de New York Times Co. v. Sullivan, ante —o una variación de éste— para determinar si la expresión en cuestión es acreedora de protección constitucional.([22]) De esta forma, si se concluye que las ex- *495 presiones fueron realizadas maliciosamente, bajo este estándar no existiría protección y procedería, por lo tanto, la imposición de la medida disciplinaria.
Una de las variaciones de esta segunda vertiente surge de lo resuelto por varios foros apelativos que han rechazado la aplicación del estándar subjetivo de “malicia real” desarrollado en New York Times Co. v. Sullivan, ante. En su lugar, han optado por un estándar más objetivo donde se analiza el aspecto de la malicia desde el punto de vista de un “abogado razonable”, considerado de acuerdo a todas sus funciones profesionales, ante las mismas o similares circunstancias. Standing Committee v. Yagman, 55 F.3d 1430, 1437 (9no Cir. 1995); U.S. Dist. Court for E.D. of Wash. v. Sandlin, 12 F.3d 861, 867 (9no Cir. 1993); Matter of Westfall, 808 S.W.2d 829, 837 (Mo. 1991), cert. denegado, 116 L. Ed. 2d 665, 112 S. Ct. 648 (1991). Así, pues, bajo el estándar objetivo, procedería la sanción disciplinaria sólo si se demuestra que ante las mismas o similares circunstancias un “abogado razonable” podría considerar falsas las ex-presiones realizadas. Por el contrario, bajo la versión subjetiva sólo tiene que demostrarse que, en efecto, el abogado conocía sobre la falsedad de sus expresiones o que las realizó sin reparar en el riesgo de que fueran o no falsas. A. Butcher y S. Macbeth, Lawyers’ Comments About Judges: A Balancing of Interests to Ensure a Sound Judiciary, 17 (Núm. 4) Geo. J. Legal Ethics 659, 668 (Verano 2004).
Otra variable introducida por los tribunales norteamericanos a esta segunda vertiente es la llamada dicotomía hecho-opinión. Sobre este particular se ha resuelto que, como regla general, las opiniones expresadas por los abogados están protegidas de sanciones disciplinarias bajo el fundamento de que éstas no son susceptibles de probarse falsas.([23]) Esta interpretación ha sido ampliamente criticada *496 en distintos foros por entenderse que se aparta de los precedentes establecidos e ignora la política pública que intenta protegerse con estas limitaciones. C.L. Roberts, Standing Committee on Discipline v. Yagman: Missing the Point of Ethical Restrictions on Attorney Criticism of the Judiciary ?, 54 (Núm. 2) Wash. & Lee L. Rev. 817, 854 (1997).([24])
La tercera vertiente desarrollada por los tribunales estatales norteamericanos, al analizar controversias de este tipo, consiste en realizar un balance entre los intereses en conflicto: por un lado, el derecho a la libertad de expresión de los abogados y, por el otro, el interés del Estado en mantener la integridad del sistema de justiciad([25]) De esta forma, se ha resuelto que si se demuestra que el Estado tiene un interés apremiante en regular la expresión en controversia, entonces la protección de la Primera Enmienda cede ante este interés y procedería la medida disciplinaria. Por el contrario, y como era de esperarse, en ausencia de este interés apremiante, prevalece el derecho a la libertad de expresión de los miembros del foro, quedando protegidos de cualquier medida disciplinaria que se relacione con la expresión realizada.
*497 VI
Dentro del marco doctrinal previamente esbozado, pasamos a atender los planteamientos presentados ante este Tribunal por el secretario Sánchez Ramos.
En su escrito el Secretario sostiene que el presente procedimiento disciplinario está vedado por la Primera Enmienda de la Constitución federal. En apoyo a su contención, cita los casos Garrison v. Louisiana, ante, New York Times Co. v. Sullivan, ante, y Letter Carriers v. Austin, 418 U.S. 264 (1974), al sostener que la expresión crítica sobre el funcionamiento gubernamental no puede ser sancionada a menos que, siendo susceptible de probarse falsa, en efecto se pruebe que dicha expresión es falsa y que ha sido hecha con pleno conocimiento o en grave menosprecio de su falsedad.([26])
Asimismo, el secretario Sánchez Ramos argumenta que “la norma sentada en New York Times Co. v. Sullivan y su progenie sólo permite sancionar expresiones críticas sobre el funcionamiento gubernamental si éstas son, en efecto, falsas”, y nos reitera que “no resulta posible sancionar aquellas cuya veracidad o falsedad no pueda ser verificada.” (Énfasis en el original.)([27]) Finalmente, y citando con aprobación los casos Standing Committee v. Yagman, ante, y Rinaldi v. Holt, Rinehart & Winston, Inc., 366 N.E.2d 1299 (N.Y. 1977), Sánchez Ramos sostiene que “cuando la expresión sea susceptible de probarse falsa (esto es, cuando no se trate de una opinión subjetiva), compete al ente acusador designado probar, en el procedimiento disciplinario correspondiente, que la expresión vertida por el abogado es, en efecto, falsa, y que ha sido hecha *498 con pleno conocimiento, o en grave menosprecio de su falsedad.” (Enfasis en el original.)([28])
De entrada, debemos puntualizar que la tesis elaborada por el secretario Sánchez Ramos en su moción de desestimación no es tan persuasiva como parece ser de primera impresión. En primer lugar, debe señalarse que los casos del Tribunal Supremo de Estados Unidos citados por el Secretario tratan más bien de pronunciamientos relacionados con sanciones civiles o criminales que fueron resueltos sin precisar en los aspectos éticos o deontológicos que hoy tenemos ante nuestra consideración. Hay que mantener presente que tampoco nos obligan los precedentes jurisprudenciales de estados norteamericanos que utiliza el secretario Sánchez Ramos para exponer los criterios que, según argumenta, se deben probar.
Según expusiéramos al inicio de esta opinión, desde hace varias décadas existen en nuestra jurisdicción unas pautas claras y específicas que nos guían en la delicada y difícil labor de evaluar la legitimidad de las expresiones que realizan los abogados contra el sistema de justicia o de sus magistrados. Como primer postulado básico hemos reconocido que la crítica, sana y respetuosa al sistema judicial constituye un interés legítimo constitucional que este Tribunal está obligado a proteger. La única limitación impuesta por este Tribunal a este libre fluir de ideas ha sido el respeto y la consideración que debe tener todo abogado hacia el sistema de justicia, sus tribunales y sus jueces.
Como señaláramos, en el caso en que un abogado hace manifestaciones contra un juez que, de su faz, parecen transgredir los cánones del Código de Etica Profesional,([29]) es de fundamental importancia determinar, en primer lugar, si las expresiones o imputaciones fueron sustanciadas *499 por el abogado o si existen motivos fundados para creer en lo expresado por éste. Únicamente en la, situación en que este Tribunal entienda que las expresiones cumplen con este primer parámetro, debemos pasar entonces, al análisis de los demás criterios, a saber: (i) “si aunque equivocado, el abogado creía en la validez de las imputaciones al juez”; (ii) “si aunque los hechos no eran ciertos, tenía motivos fundados o causa probable para creer en su veracidad”, y (iii) “si la imputación no fue hecha maliciosamente con el propósito deliberado de denigrar al tribunal”.([30]) In re Cardona Alvarez, ante, págs. 905-906.
Por el contrario, una determinación a los efectos de que el abogado realizó las crudas imputaciones sin sustanciarlas o sin tener el más mínimo motivo fundado para ello, debería ser motivo suficiente para concluir —sin mayor análisis— que se han infringido los postulados establecidos en los Cánones 9 y 38 del Código de Ética Profesional.([31])
Al evaluar el presente caso de acuerdo con la normativa antes expuesta, nos parece evidente que estamos ante el último de estos supuestos. Las expresiones realizadas por el secretario Sánchez Ramos están desprovistas de fundamentos y fueron realizadas sin señalar ni sustanciar ninguna de las críticas realizadas, basándose, únicamente, en una determinación de no causa. Llana y sencillamente, le *500 imputó, no sólo al sistema de justicia sino, además, y de forma directa, a los magistrados involucrados, haber actuado con una “doble vara” debido a la situación particular del acusado Rosselló González.
Las expresiones del Secretario de Justicia realmente no están, de forma alguna, relacionadas con algún hecho, incidente, alegación o cuadro fáctico que nos permita siquiera analizar los motivos fundados que tuvo para expresar lo aseverado o evaluar la falsedad o veracidad de sus expresiones. Tampoco en sus comparecencias el secretario Sánchez Ramos nos pone en posición de evaluar los elementos de prueba requeridos en este tipo de caso, pues se limita a alegar que lo expresado es una “opinión subjetiva” que no es susceptible de probarse falsa. Según esta premisa, y citando nuevamente jurisprudencia relacionada con casos civiles de difamación([32]) y pronunciamientos emitidos por los tribunales estatales norteamericanos, el Secretario de Justicia argumenta que “no resulta posible sancionar aquellas expresiones cuya veracidad o falsedad no pueda ser verificada”. Añade que “bajo la Primera Enmienda, existe completa inmunidad cuando la expresión vertida meramente expone una opinión subjetiva, en lugar de hechos verificables”. (Énfasis suprimido.) Moción de desestimación, 26 de marzo de 2007, pág. 6.
Rechazamos enérgicamente la adopción de una norma de este tipo en nuestra jurisdicción. Hacerlo implicaría necesariamente la abdicación total de los principios deontológicos que por décadas han regulado la profesión legal en Puerto Rico. Aunque reafirmamos nuestros pronunciamientos a los efectos de que el respeto hacia los tribunales, y su exaltación como uno de los postulados deontológicos más hermosos, no implica el establecimiento de una censura o mordaza previa —y que la crítica constructiva a la labor judicial siempre es bienvenida y necesaria— reitera *501 mos nuestra posición a los efectos de que estas críticas deben ser realizadas de manera respetuosa y fundamentada, y que no estamos en disposición de permitir que se traspasen los límites de la civilidad y corrección que exigen nuestros cánones de ética profesional.
A tono con lo anterior, conviene recordar lo expresado por este Tribunal —en ocasión de resolver el caso In re Pagán, ante, pág. 112— a los efectos de que la búsqueda de la justicia no justifica medios reprobables. Expresamos entonces: “Por sincero que fuera el sentimiento del [abogado] en cuanto a los méritos de su causa e incorrección del magistrado [que la atendió], ello no le daba derecho [al abogado] a desafiar con lenguaje selectivamente hiriente el curso procesal normal. La administración de la justicia del país se vería sumergida en el peligroso mar de los personalismos de prosperar la tesis que [se] nos propone.”
Aceptar la posición del secretario Sánchez Ramos, por el mero hecho de provenir del Secretario de Justicia de Puerto Rico, nos llevaría, ciertamente, a incurrir en la alegada práctica o patrón de conducta que sorprendentemente sirvió de base a sus infortunadas expresiones, esto es, a la utilización de una “doble vara” para juzgar a unos y a otros abogados.
VII
No obstante todo lo anteriormente expresado, consideramos que un análisis sereno de la situación ante nuestra consideración hoy inclina la balanza hacia el archivo y sobreseimiento de la queja presentada contra el secretario Roberto José Sánchez Ramos.
En primer lugar, de un examen de la totalidad de las circunstancias, resulta obvia la honesta creencia del Secretario de Justicia en la legitimidad de sus manifestaciones y, por lo tanto, la ausencia total de malicia de éste al realizarlas. Véase In re Cardona Álvarez, ante.
*502 Si a ello le añadimos que se trata de unas manifestaciones realizadas en el furor del momento respecto a un caso que había captado la atención pública y que éstas constituyen un solitario y único incidente —In re Snyder, ante— dentro de un distinguido historial de servicio público, quedamos plenamente convencidos de que es correcto el resultado al que llega la mayoría del Tribunal —de ordenar el archivo y sobreseimiento de la queja— aun cuando por fundamentos que entendemos erróneos.

(1) En lo aquí pertinente, el Canon 9 del Código de Ética Profesional establece:
“El abogado debe observar para con los tribunales una conducta que se caracterice por el mayor respeto. Ello incluye la obligación de desalentar y evitar ataques injustificados o atentados ilícitos contra los jueces o contra el buen orden en la administración de la justicia en los tribunales. Én casos donde ocurrieren tales ataques o atentados, el abogado debe intervenir para tratar de restablecer el orden y la buena marcha de los procedimientos judiciales.”

(2) El Canon 38 del Código de Ética Profesional, en su parte pertinente, dispone:
“El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia.”

(3) In re Crespo Enríquez, 147 D.P.R. 656 (1999).

(4) Finalmente, y citando el caso Garcetti v. Ceballos, 547 U.S. 410 (2006), el Representante alegó que la protección constitucional que reclama el Secretario de Justicia no aplica al presente caso, ya que sus expresiones fueron realizadas en calidad de funcionario y no como un ciudadano particular.

(5) El licenciado Sánchez Ramos cuestionó la aplicación del caso Garcetti v. Ceballos, ante, a los hechos que nos ocupan, al señalar que lo allí resuelto aplica exclusivamente en casos en que el Estado actúe en su papel de patrono y no como soberano.

(6) A esos efectos, conviene resaltar lo expresado por varios foros estatales de la jurisdicción norteamericana en cuanto a que los procedimientos disciplinarios no constituyen acciones ni civiles ni criminales, por lo que el quejoso o promovente no puede ser considerado como una “parte” en el caso. Mattice v. Meyer, 353 F.2d 316, 319 (8vo Cir. 1965); Niklaus v. Simmons, 196 F. Supp. 691, 716 (196Í).

(7) Véanse, además: In re López de Victoria I, 163 D.P.R. 1 (2004); In re Pagán, 116 D.P.R. 107 (1985); In re Rivera Carmona, 114 D.P.R. 390 (1983).

(8) Véanse, además: In re Richard Markus, 158 D.P.R. 881 (2003); In re Crespo Enriquez, 147 D.P.R. 656 (1999).

(9) Opinión emitida por un grupo de Jueces encabezados por el Juez Brennan. Otro grupo liderado por el Juez Frankfurter sostuvo que un ciudadano particular puede hacer este tipo de críticas sin ningún problema, pero que el abogado se rige por los cánones de ética profesional por lo que está impedido de realizar expresiones que tiendan a afectar la confianza pública en el sistema de justicia.

(10) En este caso, aunque no hubo una opinión de mayoría, el Tribunal Supremo de Estados Unidos revocó una suspensión de un año impuesta a una abogada que realizó expresiones críticas contra una legislación federal sobre conspiración e increpó al Gobierno sobre los métodos utilizados durante el procesamiento de sus clientes y el manejo de los casos ante los tribunales. Aunque la abogada no mencionó a ningún Juez por su nombre, hizo alusión a un caso en específico que estaba en proceso ante los tribunales. Al revocar la medida disciplinaria impuesta a la abogada, el Tribunal expresó que la prueba presentada no demostró que las expresiones fueran realizadas con la intención de impugnar la credibilidad o atacar la integridad del Juez que presidía los procedimientos.

(11) A diferencia de la regla establecida en New York Times Co. v. Sullivan, 376 U.S. 254 (1964), donde se establece una norma absoluta a favor de la verdad como defensa, en este caso el estatuto sólo la permitía cuando la expresión era publicada con buenos motivos y con propósitos justificables.

(12) Debe llamarse la atención al hecho de que en este caso no se presentó, ni el Tribunal lo abordó, el asunto desde el punto de vista ético. Ello no obstante, y como veremos más adelante, varias jurisdicciones estatales han aplicado esta normativa a casos en que se imputan violaciones éticas a abogados por expresiones realizadas contra el sistema de tribunales o sus magistrados.

(13) La carta leía, en parte, como sigue:
“In the first place, I am appalled by the amount of money which the federal court pays for indigent criminal defense work. The reason that so few attorneys in Bismarck accept this work is for that exact reason. We have, up to this point, still accepted the indigent appointments, because of a duty to our profession, and the fact that nobody else will do it.
*491 “Now, however, not only are we paid an amount of money which does not even cover our overhead, but we have to go through extreme gymnastics even to receive the puny amounts which the federal courts authorize for this work. We have sent you everything we have concerning our representation, and I am not sending you anything else. You can take it or leave it.
“Further, I am extremely disgusted by the treatment of us by the Eighth Circuit in this case, and you are instructed to remove my name from the list of attorneys who will accept criminal indigent defense work. I have simply had it.
“Thank you for your time and attention.” In re Snyder, 472 U.S. 634, 637 (1985).

(14) Durante la conferencia, el abogado aseguró que la evidencia en su poder demostraba la inocencia de su representado, adelantó información relacionada con la defensa de corrupción policiaca a ser presentada en el juicio y realizó serias imputaciones contra los testigos del estado.

(15) w.P. Hoye, Silencing the Advocates or Policing the Profession? Ethical Limitations on the First Amendment Rights of Attorneys, 38 (Núm. 1) Drake L. Rev. 31 (1988).

(16) Véanse, en general: Bd. of Prof. Ethics & Conduct v. Ronwin, 557 N.W.2d 515 (Iowa 1996); Matter of Johnson, 729 P.2d 1175, 1179 (Kan. 1986) (“Upon admission to the bar of this state, attorneys assume certain duties as officers of the court. Among the duties imposed upon attorneys is the duty to maintain the respect due to the courts of justice and to judicial officers. A lawyer is bound by the Code of Professional Responsibility in every capacity in which the lawyer acts, whether he is acting as an attorney or not, and is subject to discipline even when involved in nonlegal matters, including campaigns for nonjudicial public office”); Committee on Prof. Ethics & Conduct v. Hurd, 360 N.W.2d 96, 105 (Iowa 1984) (“Our cases make it clear that a lawyer’s right of free speech does not include the right to violate the statutes and canons proscribing unethical conduct”); State v. Russell, 610 P.2d 1122 (Kan. 1980), cert. denegado 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980); Matter of Lacey, 283 N.W.2d 250 (S.D. 1979); Matter of Frerichs, 238 N.W.2d 764 (Iowa 1976); State v. Nelson, 504 P.2d 211 (Kan. 1972); In re Raggio, 487 P.2d 499 (Nev. 1971); In re Glenn, 256 Iowa 1233 (1964).

(17) Hoye, ante.

(18) íd.

(19) Matter of Maloney, 949 S.W.2d 385, 387 (Tex. App. San Antonio 1997); Committee on Legal Ethics v. Douglas, 370 S.E.2d 325, 332 (W. Va. 1988); Ramirez v. State Bar, 28 Cal.3d 402 (1980); Baker v. Monroe County Bar Association, 311 N.Y.S.2d 70 (1970); State Bar v. Semaan, 508 S.W.2d 429 (Tex. Civ. App. 1974).

(20) Committee on Legal Ethics of W. Va. State Bar v. Douglas, ante, pág. 332.

(21) íd.

(22) U.S. Dist. Court for E.D. of Wash. v. Sandlin, 12 F.3d 861, 867 (9no Cir. 1993); In re Petition for Disciplinary Action Against Graham, 453 N.W.2d 313, 320-321 (Minn. 1990); State Bar v. Semaan, ante, págs. 432-433; Committee on Legal Ethics v. Douglas, ante.

(23) Standing Committee v. Yagman, 55 F.3d 1430, 1437 (9no Cir. 1995); In re Green, 11 P.3d 1078, 1084 (Colo. 2000). Véase, además, A. Butcher y S. Macbeth, Lawyers’ Comments About Judges: A Balancing of Interests to Ensure a Sound Judiciary, 17 (Núm. 4) Geo. J. Legal Ethics 659, 675 (Verano 2004).

(24) En este contexto se ha expresado:
“In reversing sanctions against Yagman, the Ninth Circuit departed from attorney discipline precedent that has sanctioned attorneys for criticizing the judiciary in a manner that damages the legal profession’s reputation, taints the judiciary’s appearance of impartiality, or interferes with the administration of justice. Although courts have consistently determined that the policy interests supporting the restrictions warrant the limitation of rights, the Ninth Circuit applied the First Amendment to shield Yagman from sanctions as if he were not a member of a profession that bears special obligations. If other circuits follow the Ninth Circuit’s treatment of the attorney criticism issue, attorneys will have a powerful defense to ethical restrictions on speech, and the legal profession’s reputation and the administration of justice may suffer accordingly.” Véase C.L. Roberts, Standing Committee on Discipline v. Yagman: Missing the Point of Ethical Restrictions on Attorney Criticism of the Judiciary ?, 54 (Núm. 2) Wash. & Lee L. Rev. 817, 854 (1997).

(25) Véanse, en general: State ex rel. Counsel for Dis. v. Beach, 722 N.W.2d 30 (Neb. 2006); In re Landrith, 124 P.3d 467 (Kan. 2005); Matter of Riley, 691 P.2d 695 (Ariz. 1984); State ex rel. Neb. State, etc. v. Michaelis, 316 N.W.2d 46 (Neb. 1982); Kentucky Bar Ass’n v. Heleringer, 602 S.W.2d 165 (Ky. 1980); State v. Russell, ante. Hoye, ante.

(26) Véase Moción de desestimación, 26 de marzo de 2007, pág. 4.

(27) íd., pág. 6.

(28) íd., pág. 12.

(29) A manera de ejemplo, manifestaciones en que se le imputa a un juez en particular haber actuado con deshonestidad, prejuicio, pasión y parcialidad, entre otras.

(30) Esta normativa es enteramente compatible con la esbozada para este tipo de expresión en los casos New York Times Co. v. Sullivan, ante, y Garrison v. Louisiana, ante.
Para realizar este análisis es indispensable que se realice una determinación preliminar sobre la veracidad o falsedad de lo aseverado. En el caso de que se determine que, en efecto, se trata de una expresión falsa procederá, entonces, analizar el conocimiento de esta falsedad y si la expresión se realizó con grave menosprecio de si era o no falsa.

(31) Esto es, al abogado haber fallado en “observar con los tribunales una conducta que se caracterice por el mayor respeto” y al fallar en dar el esfuerzo, “al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión”, respectivamente.
Naturalmente, y dependiendo de las circunstancias particulares del caso, deberá señalarse una vista evidenciaría, de ser procedente y de ser solicitada. En este caso la vista es innecesaria en virtud de la posición asumida por el Secretario, a los efectos de que lo expresado por él es una opinión subjetiva que no es susceptible de probarse falsa. ¿Para qué, entonces, la vista?

(32) Letter Carriers v. Austin, 418 U.S. 264 (1974).